| | | |
|---|---|---|
| DIANA LONSFOOTE, | ) | |
| | ) | No. 12 C 1732 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Diana Lonsfoote seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). R. 1. *See* 42 U.S.C. §§ 416(i), 423(d), 1381(a). Lonsfoote asks the Court to reverse and remand the Commissioner's decision. R. 15; 16. For the following reasons, Lonsfoote's motion for summary judgment is denied, and the Court affirms the ALJ's conclusion that Lonsfoote is not entitled to disability benefits.

## PROCEDURAL HISTORY

Lonsfoote applied for DIB and SSI on March 12, 2009, alleging disability beginning on March 5, 2009. Administrative Record ("AR.") at 14.[2] Those claims

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of the Social Security Administration on February 14, 2013—is automatically substituted as the named Defendant.

were denied on July 17, 2009, and denied again on reconsideration on October 16, 2009. AR. at 72-76, 78-82. Lonsfoote requested a hearing before an administrative law judge ("ALJ"), which she received on July 14, 2010. AR. at 29-67, 154. On November 22, 2010, the ALJ issued a decision finding Lonsfoote not disabled. R. 7 at 23. Lonsfoote applied for review from the Appeals Council, but her request was denied, AR. at 9; making the ALJ's decision the final decision of the Commissioner. *See Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Lonsfoote then initiated this civil action for judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## BACKGROUND

### I.   Vocational Evidence

Lonsfoote, who was thirty-seven at the onset of her disability claim, graduated high school and received training for medical transcription. AR. at 35. Prior to this action, she last worked as a medical coder at Lutheran General Hospital in Ridge Park, Illinois—a job that involved taking information from charts and collating them into a form. AR. at 32-34. During the last six months of her employment at Lutheran General, the files she worked with became electronic, so lifting objects was no longer a job requirement. AR. at 54.

---

[2] All citations to the Administrative Record, Docket numbers 7 and 8, are "AR. at ___." All other citations are to the documents' Docket numbers, as "R. ___."

## II.    Medical Evidence

### A.    Dr. Regina Schueneman – Lonsfoote's Personal Physician

Lonsfoote had an MRI and a CT scan performed on March 2, 2009, at the behest of Dr. Schueneman. AR. at 293-94. The images indicated a grade 1 spondylolisthesis of L5 upon S1 (the lower back).[4] AR. at 293-94. In response, Lonsfoote received a lumbar epidural steroid injection for pain management on April 22, 2009, and another on May 7, 2009, though she claimed to receive little reduction in pain. AR. at 295, 297.

Lonsfoote had an appointment with Dr. Schueneman on April 27, 2009, during which she complained of pain. AR. at 335. After examining Lonsfoote, Dr. Schueneman noted on April 30 that Lonsfoote was "physically unable to perform work duties secondary to pain" but found that Lonsfoote (1) did not suffer any serious limitation in her "ability to understand, carry out, and remember instructions on a sustained basis," or (2) have any serious limitations in her ability to respond to work pressures. AR. at 337. Dr. Schueneman further opined that Lonsfoote could "sit and stand for 10-15 minutes at a time"; "may not lift greater than 10 pounds"; and "could ambulate[] well, but sometimes need[ed] the assistance of a cane." AR. at 334. Dr. Schueneman made a similar assessment on July 20, 2009, noting that Lonsfoote could return to work with the following restrictions: no

---

[4] Spondylolisthesis is the forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, usually due to a developmental defect in the pars interarticularis (the part of the lamina between the superior and inferior articular processes of a lumbar vertebra). *Dorland's Illustrated Medical Dictionary*, 1237, 1563 (28th ed. 1994).

lifting more than 15 pounds, no sitting for more than 30 minutes at a time, and no standing for more than 15 minutes at a time." AR. at 376.

**B.  Dr. Szymon Rosenblatt & Dr. Bryan Bertoglio – Neurologists**

Lonsfoote saw Dr. Rosenblatt on May 29, 2009, for her back pain. AR. at 340. Dr. Rosenblatt noted Lonsfoote's contention that the steroid injections provided little relief and that the pain made physical therapy difficult. AR. at 340. Nonetheless, Dr. Rosenblatt recommended that Lonsfoote "complete a course of physical therapy" despite any underlying pain. AR. at 341. On August 25, 2009, Dr. Rosenblatt opined that all conservative measures had been exhausted, as Lonsfoote "continue[d] to complain of worsening back pain and bilateral lower extremity pain," and therefore suggested that surgery was the next option. AR. at 339.

Dr. Bertoglio became Lonsfoote's treating neurologist on September 18, 2009. AR. at 381. He performed a L5-S1 fusion surgery (the fusing of two vertebra in the spine) and a laminectomy (a surgical procedure removing the lamina, a portion of the vertebral bone) on October 8, 2009, in an attempt to reduce Lonsfoote's lower back pain. AR. at 437-38. While at the hospital, and before being discharged, Lonsfoote underwent an MRI that indicated a hematoma (large bruise) at the incision site. AR. at 440. She opted for conservative management and thus waited for the hematoma to resolve itself. AR. at 440. The combined surgery initially alleviated some pain, but Lonsfoote continued to experience pain in her back and left leg. AR. at 416.

On November 17, 2009, Dr. Bertoglio completed a "Residual Capabilities Questionnaire" in which he opined that (1) Lonsfoote's impairments would cause her to be absent from work more than three times a month, and (2) positional and activity limitations, as well as side effects from her medication, would affect Lonsfoote's ability to work at a regular job on a sustained basis. AR. at 381-82. Dr. Bertoglio also wrote Lonsfoote's counsel a letter on that day in which he stated that Lonsfoote had developed left lower extremity radiculopathy (nerve problems). AR. at 383. On November 19, 2009, Lonsfoote returned for a follow-up visit; Dr. Bertoglio noted that Lonsfoote continued to complain of pain, and his examination revealed 4/5 strength with dorsiflexion (foot/ankle bending and moving) on her left side. AR. at 415. An x-ray showed "intact instrumentation and stable alignment" of Lonsfoote's lumbar spine. AR. at 415. A CT scan was ordered to determine whether the October 8, 2009 fusion had failed. AR. at 415.

On January 26, 2010, Dr. Bertoglio performed a left nerve root decompression in Lonsfoote's lower back, a dissection of the scar, and a modification of the initial L5-S1 screw fusion. AR. at 423. Lonsfoote saw Dr. Bertoglio for a follow-up examination on April 15, 2010. AR. at 414. Dr. Bertoglio noted Lonsfoote's contention that her pain was as severe as it was before the second surgery. AR. at 414. He opined that further surgery would not benefit Lonsfoote and encouraged her to reconsider epidural steroids for pain management. AR. at 414.

On July 21, 2010, Dr. Bertoglio completed a "Report of Treating Physician." AR. at 454. He wrote that the "distribution of pain correlates with the nerve

affected" and that Lonsfoote's pain medications "would be expected to cause fatigue." AR. at 454. Dr. Bertoglio also wrote that Lonsfoote's pain and the effects of her medication "would be expected to distract her from competitive workplace performance," and checked the box indicating that Lonsfoote would be expected to be off task more than 20% of the workday. AR. at 455.

### C.    Dr. Sanjay Sundar & Dr. Amit Mehta – Pain Specialists

On December 4, 2009, Dr. Sundar examined Lonsfoote. AR. at 406. Lonsfoote denied being fatigued or having psychological issues at that time. AR. at 407. A physical exam revealed pain during flexion and extension of the spine. AR. at 407. Dr. Sundar recommended continued use of opiates and opined that Lonsfoote may benefit from epidural steroid injections while awaiting further consultation on surgery. AR. at 408. On December 30, 2009, Lonsfoote saw Dr. Sundar for a second time. She had similar complaints; Dr. Sundar made similar findings. AR. at 404-05.

On February 15, 2010, Lonsfoote complained to Dr. Mehta about pain in her left leg and foot. AR. at 402. A straight leg raising test[5] was positive on the left side. R. 402. Dr. Mehta continued Lonsfoote's medication to alleviate Lonsfoote's symptoms. AR. at 403. On March 11, 2010, Lonsfoote complained of deep throbbing pain in her back but said the pain had lessened since her last visit; she rated it a

---

[5] A straight leg raising test stretches the tendons and nerve roots and gives information about the nerves and synoptic connections within the spinal cord. *The Merck Manual of Diagnosis and Therapy* at 1384, 1516 (16th ed. 1992). A straight leg raising test that produces back or leg pain is said to be "positive" and may indicate a herniated nucleus pulposus. *Id.* A straight leg raising test that produces no pain is said to be "negative." *Id.*

5/10. AR. at 400. A straight leg raising test was again positive. AR. at 400. Dr. Mehta noted that medication helped alleviate the symptoms. AR. at 401. On April 8, 2010, Lonsfoote saw Dr. Mehta with similar complaints; Dr. Mehta made similar findings. AR. at 448.

Lonsfoote saw Dr. Mehta on May 6, 2010, and Dr. Mehta prescribed Percocet and Oxycodone for Lonsfoote's pain. AR. at 446-47. Four days later, Lonsfoote saw Dr. Schueneman and informed the doctor that she did not want to have any more injections; she only wanted medication to manage her pain. AR. at 450. Accordingly, Lonsfoote stopped seeing Dr. Mehta and was referred to a new pain specialist. AR. at 450.

On May 18, 2010, Dr. Mehta completed a "Pain Report" and checked one box indicating that Lonsfoote's pain was not "completely" alleviated through medication, and another box indicating that the pain had an effect on Lonsfoote's "ability to sustain concentration and attention." AR. at 453.

### D.    Dr. Uzoma Okoli – Psychiatric Consultative Examiner

On October 4, 2010, Lonsfoote had a psychiatric consultative exam with Dr. Okoli. AR. at 456-63. Dr. Okoli noted that Lonsfoote walked slowly but without support or a limp. AR. at 461. Lonsfoote demonstrated some memory problems when she could not recall the words "California, airplane, [and] brown" after five minutes. AR. at 462. When asked to serially subtract 7 from 100, Lonsfoote counted, "93, 86, 74." AR. at 462-63. However, Lonsfoote gave correct similarities between associated words, interpreted a proverb, and spelled the word "world" backwards.

7

AR. at 462-63. Dr. Okoli opined that Lonsfoote's insight and judgment were "fair," that she had an "adequate ability to maintain attention," and that she was alert and relatable. AR. at 463. Dr. Okoli checked a box indicating Lonsfoote did not have an impairment that would affect her ability to "remember, understand, and carry out instructions." AR. at 458.

### E.    Disability Determination Service – State Agency

On June 25, 2009, Dr. Ernst Bone from the Disability Determination Service ("DDS") conducted a physical residual function capacity ("RFC") assessment of Lonsfoote. AR. at 361. Dr. Bone opined that Lonsfoote's alleged limitations were "partially credible" and that the evidence "support[ed] some restrictions." AR. at 361. For example, Lonsfoote had limited range of motion of the spine and "tender points" from fibromyalgia (8 out of 18 were positive).[6] AR. at 355, 361. The RFC said Lonsfoote could: (1) occasionally lift 20 pounds; (2) frequently lift 10 pounds; (3) stand or walk for 2 hours in an 8-hour workday with the assistance of a "hand-held device" if necessary; (4) sit for six hours in an 8-hour workday; and (5) "push and/or pull (including operation of hand and/or foot controls)" without limitation "other than as shown for lift and/or carry." AR. at 355.

On July 13, 2009, Dr. Keith Burton from the DDS conducted a psychiatric RFC assessment. AR. at 362. Dr. Burton noted that Lonsfoote read and sewed in

---

[6] Fibromyalgia is a rheumatoid disorder that causes pain all over, fatigue, and stiffness. *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). There are no laboratory tests to determine whether it is present or its severity, and it is usually diagnosed by a finding that the patient is positive for 11 out of 18 "tender points," i.e., certain areas on the body that elicit pain when pressed with a finger. *Id.*

her free time. AR. at 374. Dr. Burton opined that there were no limitations on her "ability to understand, carry out and remember instructions" or "perform tasks on an autonomous basis without step-by step supervision and direction." AR. at 374. He also opined that Lonsfoote's ability to perform complex activities with the "concentration, persistence, and pace for competitive work" remained unimpaired by a mental condition. AR. at 374. And to the extent Lonsfoote alleged "difficulties in maintaining social functioning," Dr. Burton checked the "mild" box. AR. at 372.

In October 2009, Lonsfoote saw the DDS to reconsider her initial RFC assessments. R. 380. The DDS stated that Lonsfoote's "impairments at the reconsideration level [were] essentially the same" as when the DDS made its first RFC assessment. AR. at 380. The DDS then concluded that Lonsfoote's allegations were "partially credible," in that she had a medically determinable impairment ("MDI") but that the alleged "intensity of the symptoms and their impact on her functioning were not consistent with the totality of the evidence." AR. at 380.

### F.    Dr. Roopa K. Karri – Internal Medicine Consultative Examiner

On June 4, 2009, Lonsfoote had a consultative examination with Dr. Karri. R. 345-49. Dr. Karri did a blood test to measure the amount of the rheumatoid factor antibody in Lonsfoote's blood to determine whether Lonsfoote had rheumatoid arthritis. AR. at 346. The results revealed a positive rheumatoid factor "on and off." AR. at 346. He noted that Lonsfoote could not tandem gait[7] or walk heel/toe, but the straight leg raise test was negative. AR. at 348. Dr. Karri noted that Lonsfoote's

---

[7] Tandem gait is a method of walking in which the toes of the person's back foot touch the heel of the person's front foot at each step.

range of motion in her hips, knees, ankles, and cervical spine was normal, though Lonsfoote could not straighten her back. AR. at 348. Dr. Karri further noted tenderness in the lumbar spine and 8/18 fibromyalgia tender points. AR. at 348. Lonsfoote was, however, "able to get on and off the exam table." AR. at 348. Lonsfoote did not have any cognitive or mental difficulties during that consultation. AR. at 348.

## III.    Administrative Hearing Testimony

The ALJ conducted an administrative hearing on July 14, 2010. Numerous individuals testified regarding Lonsfoote's condition, including Lonsfoote herself.

### A.    Lonsfoote's Testimony

Lonsfoote first testified about her duties as a medical coder at Lutheran General Hospital. She testified that her job was to take information from medical charts and collate the data if the patients were in a certain class. AR. at 34. Lonsfoote stated that she left the job because Dr. Schueneman told her to stay at home in order to reduce the risk of falling and further injuring her spine. AR. at 35-36. Lonsfoote testified that Dr. Schueneman said that she would call Lonsfoote's boss about her back condition if Lonsfoote did not take medical leave. AR. at 36. Lonsfoote stated that she fought Dr. Schueneman for six months on whether she could continue to work until Lonsfoote finally agreed to take a temporary leave from work until she underwent surgery. AR. at 36.

Lonsfoote testified that she "pushed past" the pain, but that the pain was distracting and the medication she took to alleviate the pain made her drowsy. AR.

at 37. When asked whether it affected her work performance, Lonsfoote stated that her audits showed that she had missed more cases than normal. R. 38. She testified that she was never given a formal warning, but the audits were a warning in and of themselves. AR. at 39. During her last six to eight months at Lutheran General Hospital, Lonsfoote did not have to lift physical files because they were all electronic. AR. at 54.

When asked about her visit to a psychiatrist, Lonsfoote testified that she had visited one in 2007 or 2008 because Dr. Schueneman was concerned that the chronic pain she experienced may have led to depression. AR. at 45. Lonsfoote testified that she did not feel depressed and only went to appease Dr. Schueneman. AR. at 45.

**B.    Medical Examiner's Testimony**

Dr. Julian Freeman was the medical expert ("ME") at the administrative hearing. The ME testified that there was a forward slippage of the vertebrae and a disc protrusion, but neither of those problems caused impairment, nerve root compression (pressure on the nerve causing pain, tingling, numbness, or muscle weakness), or any major problems. AR. at 46. The initial CT scan in March 2009 did not show root compression or significant spinal stenosis (abnormal narrowing of the spinal canal). AR. at 46. The ME testified that there was evidence of root compression after the first surgery, but the surgery did not affect Lonsfoote's sensation and reflexes. AR. at 46. The ME stated that there was no arachnoiditis (inflammation of the arachnoid, a membrane that surrounds and protects a person's nerves) after the first surgery. AR. at 47. Additionally, there was a damaged nerve

root on the left side of Lonsfoote's lower back that appeared to be a consequence of the surgery. AR. at 47.

The ME testified that there appeared to be a "high degree" of somatization.[8] AR. at 47. He stated that the nerve damage in the record would cause limited weakness allowing light to sedentary work with occasional postural changes. AR. at 48, 51. The ME testified that the nerve root problem could be the cause of discomfort in Lonsfoote's lower extremities. AR. at 56. When asked if he thought whether the other doctors found Lonsfoote's pain to be credible, the ME said he could not say but the records did not indicate that any of the doctors would have expertise in the area to make a relevant conclusion. AR. at 57. He stated, "The technical expert credibility assessment is a question of whether the person actually believes what they are saying. And there is no indication that these physicians are skilled in that expertise." AR. at 57. The ME concluded:

> The records indicate that after [Lonsfoote's] surgery her minimal level of function would be at the sedentary work[9] range and quite likely into the light work range. In other words, the minimum would be two to four hours of walking and standing in 10 [hour] . . . periods. Lift and carry, pushing and pulling 10 pounds occasionally or frequently but within the walking and standing limitations, and only occasional

---

[8] Somatoform disorder is characterized by persistent reports of pain that are not accounted for by a medical condition or another mental disorder. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 445 (4th ed. 1994).

[9] Sedentary work involves "lifting no more than 10 pounds at a time" and involves sitting with only occasional walking and standing. 20 C.F.R. § 404.1567(a). Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." § 404.1567(b). It also involves a "good deal of walking or standing" with "some pushing and pulling of arm or leg controls." *Id.*

postural changes. The maximum, based on the L5 [damaged nerve root], that most people would be able to attain in our culture would be 20 pounds occasional[ly], 10 pounds frequent lift and carry or pushing and pulling, six hours of walking and standing a day in half-hour periods, and occasional postural changes. In other cultures a substantially higher level of physical activity would be expected.

AR. at 47-48.

### C.     Vocational Expert's Testimony

Linda Gels was the vocational expert ("VE") at the hearing. She testified that Lonsfoote's work satisfied the clinical description of medical coder. AR. at 54-55. The VE was asked if limitations requiring a change in posture every ten to fifteen minutes and lifting no more than ten pounds, identical to the limitations Dr. Schueneman identified on April 30, 2009, *see* AR. at 334, would preclude work. AR. at 58-59. The VE opined that Lonsfoote could still work as a medical coder, but only if she could continue working after changing positions and while standing up. AR. at 59. If Lonsfoote needed to walk for that time rather than work, however, then Lonsfoote would not be capable of work at any exertional level. AR. at 59. The latter situation would prevent Lonsfoote from performing her past job or any unskilled, sedentary job. AR. at 63.

### IV.    The ALJ's Decision

The ALJ denied Lonsfoote's disability claim on November 22, 2010. In the written decision, the ALJ followed the five-step process outlined in 20 C.F.R. § 404.1520. AR. at 14-23; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

At step 1, the ALJ found that Lonsfoote was not currently employed and had not engaged in substantial gainful activity since March 5, 2009, the alleged onset

date of her disability. AR. at 16. At step 2, the ALJ concluded that Lonsfoote has three severe impairments: degenerative lumbar disc disease, obesity, and depression. AR. at 16. At step 3, the ALJ determined that none of Lonsfoote's impairments or combination of impairments—mental or physical—met or equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR. at 17. At step 4, the ALJ concluded that Lonsfoote has the RFC "to perform sedentary work as defined in [20 C.F.R. 404 §§ 1.1567(a) and 416.967(a)] except she needs the option to alternate between sitting and standing every 15 minutes." AR. at 18. In doing so, the ALJ then explained that Lonsfoote's impairments could cause the alleged symptoms, but that Lonsfoote's "statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they are inconsistent" with Lonsfoote's RFC. AR. at 18. Based on that credibility finding, the ALJ found at step 5 that Lonsfoote is capable of performing her past work as a medical coder and that performing the work did not involve activities precluded by her RFC. AR. at 22. Thus, Lonsfoote was not under a disability under the SSA, and her claim was denied. AR. at 23.

## STANDARD OF REVIEW

This Court reviews the ALJ's decision deferentially and will uphold it if "substantial evidence" supports the decision. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ is responsible for resolving any conflicts between the evidence and whether the plaintiff is disabled. *Vinion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). In doing so, the ALJ need not address every piece of evidence or testimony—i.e., only a "logical bridge" between the evidence and the ALJ's conclusions is required. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This is a "lax" standard, as the ALJ is only required to "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Berger v. Astrue*, 516 F.3d 539, 544-45 (7th Cir. 2008). In conducting its review, the Court may not reweigh the evidence or substitute its own judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

## ANALYSIS

Lonsfoote advances five arguments as to why the ALJ's decision must be reversed: (1) the ALJ's credibility assessment is not adequately supported by the record; (2) the ALJ erroneously gave "little weight" to two treating physicians; (3) the ALJ erred in not finding her fibromyalgia a "severe" impairment; (4) the ALJ did not properly consider symptoms he deemed "severe" when making his RFC assessment; and (5) the record evidence does not support a finding that Lonsfoote could perform her past work. The Court addresses each argument in turn.

## I.     Lonsfoote's Credibility

Lonsfoote's first challenge is to the ALJ's determination that her testimony was not credible to the extent it was inconsistent with the RFC assessment. *See* AR. 18. The Court will only disturb the ALJ's finding of credibility if it is "patently

wrong" or lacks any explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Lonsfoote contends "[t]he ALJ failed to consider the entire case record when making his credibility determination, as required." R. 16 at 14 (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). In making a credibility determination based on the entire record, the ALJ must consider: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain; (3) any precipitating and aggravating factors to the pain; (4) the type, dosage, effectiveness, and side effects of the claimant's medication; (5) other treatments received to relieve the claimant's pain; (6) other measures taken to relieve the claimant's pain; and (7) any other relevant factors. 20 C.F.R. § 404.1529(c)(3); *see also* Social Security Ruling 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The ALJ did that here.

The ALJ began by discussing Lonsfoote's daily activities, including reading and sewing, which indicate Lonsfoote could concentrate fairly well. AR. at 21; s*ee Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (explaining that a claimant's claim of concentration problems was inconsistent with her ability to read, watch television, and play cards). He then attributed Lonsfoote's limited ability to drive to Lonsfoote's back pain which resulted from sitting for twenty minutes, not because of any concentration difficulties. AR. at 21. The ALJ considered the frequency of Lonsfoote's pain when he noted that Lonsfoote did not need a walker during her appointment with Dr. Okoli. AR. at 20. This fact is by no means dispositive, as a

person with a chronic disease is bound to have good and bad days. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). However, it does indicate that the intensity of Lonsfoote's pain may not be as severe as she claims, or at least not as persistent, which is consistent with the ALJ's note that Lonsfoote failed to follow up with Dr. Bertoglio's "medical advice for injections" and stopped seeing Dr. Mehta, a pain specialist. AR. at 20-21. This conclusion is further bolstered by the ALJ's statement that, "in May 2010, Dr. Schueneman wrote an addendum to a May 2010 progress note stating [Lonsfoote] was not willing to consider injections, suggesting medications control [Lonsfoote's] pain to a greater degree than asserted." AR. at 20.

In addition to these comments, as well as the ALJ's thorough explanation of the medical record and Lonsfoote's prior medical history, *see* AR. at 18-23, the ALJ discussed Lonsfoote's ability to work in the past despite taking narcotics. AR. at 20. He determined that this undermined Lonsfoote's credibility regarding her fatigue and lack of concentration. AR. at 20-21. And this determination cannot be patently wrong when, despite complaints of pain, Lonsfoote repeatedly rejected epidural injections, *see* AR. at 408, 414, 550; and Dr. Freeman said there was a disconnect between the level of pain Lonsfoote claimed to suffer and level of pain the medical evidence suggested. *See Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) (stating that "discrepancies between the objective evidence and self[-]reports may suggest symptom exaggeration"). Moreover, the ALJ discussed Lonsfoote's contention that Dr. Schueneman "forced" her to stop working. AR. at 20. As the ALJ noted, the reality is Dr. Schueneman simply said he would report Lonsfoote's back condition to

her employer if she continued to work; he did not say she was "actually unable to do the work." AR. at 20; *see* AR. at 334. The Court cannot find fault with the ALJ's determination that Lonsfoote's characterization of her interaction with Dr. Schueneman directly undermined Lonsfoote's credibility. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) ("Appellate review of credibility determinations, especially when made by specialists such as the administrative law judges of the Social Security Administration, is highly limited because the reviewing court lacks direct access to the witnesses . . . , lacks the trier's immersion in the case as a whole, and when reviewing decisions by specialized tribunals also lacks the trier's experience with the type of case under review.").

The ALJ in this case was required to provide a "logical bridge" between the evidence and his conclusions. *Terry*, 580 F.3d 475. He did that. Lonsfoote was thus required to "do more than point to a different conclusion that the ALJ could have reached to demonstrate that [the ALJ's] credibility determination was patently wrong." *Jones*, 623 F.3d at 1162. She did not, so her challenge to the ALJ's credibility determination fails.

## II.    The Weight Given to Treating Physicians

The ALJ gave little weight to two of Dr. Bertoglio's opinions: (1) his November 17, 2009 assessment of Lonsfoote's limitations and his conclusion that activities such as "lifting, stooping and reaching, performed occasionally through the workday" would "frequently" aggravate Lonsfoote's pain, AR. at 21; *see* AR. at 381-82; and (2) his July 21, 2010 assessment that Lonsfoote's pain and medications

would be expected to distract her from doing competitive work, as well as that Lonsfoote's concentration and attention were "impacted to a degree that . . . Lonsfoote, if at a job, would expect to be off task more than 20% of the workday." R. 21; *see* AR. at 454-55. The ALJ also gave little weight to Dr. Mehta's May 18, 2010 assessment that Lonsfoote's pain affected her ability to sustain attention and concentration. AR. at 21; *see* AR. at 452-53.

Lonsfoote first argues that the ALJ improperly gave "little weight" to these physicians' opinions. R. 16 at 9. Alternatively, Lonsfoote contends the ALJ failed to sufficiently describe his analysis of the required factors for evaluating the weight to be given to those opinions. R. 16 at 12. Both arguments fail.

The ALJ will "generally" give controlling weight to a treating physician's opinion on the "nature and severity of the impairment(s) [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence . . . ." 20 C.F.R. § 404.1527(c)(2). If the ALJ does not give the opinion such weight, however, he is "required to provide a sound explanation for his decision to reject" and, instead, adopt another physician's opinion. *Roddy v. Astrue*, 705 F.3d 631, 636-37 (7th Cir. 2013). And when controlling weight is not given to a treating physician's opinion, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationships, the frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *see* 20 C.F.R. § 404.1527(c).

Lonsfoote begins her challenge with Dr. Bertoglio's November 17 assessment, which the ALJ rejected because Lonsfoote had back surgery one month before and "it was too early post-surgery to make an assessment as to long term functioning." AR. at 21. She argues the opinion was not given too early because "the treating medical expert disagreed—and was correct!" R. 16 at 10. But this argument is not persuasive. The ALJ's conclusion that the assessment was premature is supported by the narrative report Dr. Bertoglio himself provided that day. In that report, he stated that Lonsfoote's "low back pain has responded well [and] progressed within expectations for a successful recovery." AR. at 383. And two days later, Dr. Bertoglio ordered a CT scan to determine the success of the surgery and referred Lonsfoote to a clinic for further evaluation. AR. at 415. These reports indicate that it was too early for Dr. Bertoglio to make a proper assessment of Lonsfoote's long-term functionality; the success and outcome of that surgery were not foreseeable at that time. In light of the entire evidentiary record, the Court finds these to be "good reasons" for rejecting the November 17, 2010 assessment. *See* 20 C.F.R. § 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) ("An ALJ must offer good reasons for discounting a treating physician's opinion.") (internal quotation marks omitted).

Lonsfoote next finds fault with the ALJ's rejection of Dr. Bertoglio's later opinion on July 21, 2010, to which the ALJ gave little weight because it was "not backed up by appropriate objective medical findings to support such significant limitations," and Lonsfoote rejected Dr. Bertoglio's suggestion that she receive

additional. injections. AR. at 21. The basis for the ALJ's conclusion regarding Dr. Bertoglio's July 21, 2010 opinion is the same rationale the ALJ applied when affording little weight to Dr. Mehta's assessment, which Lonsfoote also contests: the medical findings did not back up that assessment and Dr. Mehta's recent medical findings (before he stopped treating Lonsfoote) did not include concentration or attention problems. AR. at 21.

Lonsfoote argues that there were numerous objective tests and observations to support both of the assessments, and therefore, substantial evidence cannot support the ALJ's resolution of the various physicians' opinions. R. 16 at 10-11. She directs the Court to positive leg raise tests, decreased range of motion in the lumbar spine, dorsiflexion weakness, inability to heel/toe walk, and MRIs indicating degenerative disc disease and spondylolisthesis. R. 16 at 10-11. The Court acknowledges that the objective tests indicate Lonsfoote suffers from an MDI that would reasonably produce pain, the first step under 20 C.F.R. § 404.1529, but these objective tests do not indicate the level of pain. Here, the ALJ recognized the underlying MDI, AR. at 18; however, he rejected Lonsfoote's claim that she suffered from a degree of pain that would render her incapable of performing competitive work. AR. at 20-23. As discussed above, the credibility finding was not patently wrong; thus, it makes sense the ALJ would be skeptical of the physician opinions that were seemingly based only on Lonsfoote's subjective complaints. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ

should rely need to be based on objective observations and not amount merely to [a] citation of a claimant's subjective complaints.").

Furthermore, when considering the medical evidence and laboratory findings and in determining the intensity of Lonsfoote's pain under 20 C.F.R. § 404.1529(c)(2), the ALJ considered the record as a whole and gave the greatest weight to the moderate assessments from Dr. Schueneman, Dr. Okoli, and Dr. Freeman. Despite the objective tests Lonsfoote relies on, the record contains conflicting opinions regarding the severity of Lonsfoote's pain and its effect on her capability to perform competitive work. Dr. Bertoglio and Dr. Mehta provided assessments that Lonsfoote would have trouble concentrating due to pain and medication, AR. at 382, 453-55; and Dr. Bertoglio opined that Lonsfoote would be limited by positional and activity limitations. AR. at 382. Dr. Schueneman implicitly disagreed (her opinion was given prior to Dr. Bertoglio and Dr. Mehta's) and made assessments that Lonsfoote could work with limitations placed on the weight she could lift and the amount of time she could stay in one position. AR. at 334, 376. Dr. Freeman made a similar assessment and opined that there was a disconnect between the level of pain Lonsfoote claimed to have and the level of pain the medical evidence suggested. AR. at 48, 51. Dr. Okoli opined that Lonsfoote was able to understand and remember instructions and that she could adequately maintain attention despite some memory problems. AR. at 458, 463. The DDS doctors also made assessments, but theirs had even looser restrictions than Dr.

Schueneman and Dr. Freeman's assessments. *Compare* AR. at 380, *with* AR. at 334, 374.

Taken together, substantial evidence supports the ALJ's decision. First, the ALJ adopted the assessment of Lonsfoote's longest treating physician, Dr. Schueneman. Dr. Schueneman's assessments were corroborated by Dr. Freeman, who had the opportunity to review the entire record. It is true that the ALJ cannot reject Dr. Bertoglio and Dr. Mehta's opinions on that ground alone—i.e., that Dr. Freeman, a non-examining physician, reached a contradictory opinion. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, *by itself*, suffice.") (emphasis added). Here, however, Dr. Schueneman and Dr. Freeman's assessments go hand in hand; the ALJ did not solely rely on Dr. Freeman's opinion to reject the opinions of Dr. Bertoglio and Dr. Mehta.

Additionally, "[i]t is appropriate for the ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation" because they have reviewed the entire record, and that fact "strengthens the weight of their conclusions." *Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). Dr. Okoli opined that Lonsfoote did not have an impairment that would affect her ability to "remember, understand, and carry out instructions." AR. at 458-60. In doing so, Dr. Okoli implicitly rejected Dr. Mehta's report where Dr. Mehta checked a box indicating concentration problems but also indicated he was

"unsure" about Lonsfoote's exertional abilities. AR. at 458-60. Dr. Okoli also rejected Dr. Bertoglio's brief comment on a pre-written form that pain and medication would prevent Lonsfoote from working, AR. at 458-60, which courts are not required to give controlling weight if other facts dictate an opposing conclusion. See *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (declining to give an unexplained answer of "yes" on a pre-printed form controlling weight because it was not supported); *Jackson v. Barnhart*, No. 01 C 7387, 2003 WL 21011798, at *9 (N.D. Ill. May 5, 2003) ("The mere fact that Dr. Gonzalez checked various boxes on a pre-printed form indicating that Jackson could perform medium work does not render his unexplained opinion substantial evidence of Jackson's abilities.").

Lonsfoote asserts in her reply brief that Dr. Okoli's assessment on October 4, 2010, did not include pain symptoms because he wrote that the "physical problems related to her back were not addressed in this psychiatric evaluation." R. 24 at 2 (citing AR. at 459). That is true. But Lonsfoote's contention that "her chronic pain" causes her concentration difficulties, R. 24 at 2, in no way undermines Okoli's overall conclusion that Lonsfoote's ability to "understand, remember, and carry out instructions" was unaffected by an impairment. AR. at 458. In other words, if Lonsfoote's mental comprehension was affected in some way, Dr. Okoli would have made note of it, regardless of whether the source was a mental disorder (e.g., depression) or chronic pain from a physical ailment.

Moreover, Lonsfoote insinuates that the ALJ cherry-picked information when she writes that the "ALJ may not parse through the record and grab isolated

evidence to support an opinion," R. 24 at 1, which the Court notes would be impermissible if true. *See Scott*, 647 F.3d at 740. Yet, it is Lonsfoote who cherry-picks information from Dr. Okoli's overall evaluation when she argues, "What is relevant is that Dr. Okoli did document severe concentration and focus limitations with the Plaintiff unable to do serial 7s and to remember simple information after only five minutes." R. 24 at 2 (citing AR. at 463). This individual observation is undercut by Okoli's general conclusion: "[Lonsfoote], however, demonstrate[s] adequate ability to maintain attention." *See* AR. at 463. The Court believes Dr. Schueneman and Dr. Freeman's medical opinions, coupled with Dr. Okoli's findings, constitute substantial evidence and were sufficient to allow the ALJ to give little weight to the other physician's opinions.

Next, there is no procedural error in the ALJ's explanation; the ALJ properly considered the factors listed in 20 C.F.R. § 404.1527(c) in making his determination. 20 C.F.R. § 404.1527(c)(2) provides that an ALJ must consider "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion" when determining what weight to give a treating physician's opinion. *Campbell*, 627 F.3d at 308 (internal quotations omitted); *see* § 404.1527(c)(2). Here, the ALJ noted that Dr. Mehta is a pain doctor who treated Lonsfoote for six months, but he also noted that Dr. Mehta had stopped treating Lonsfoote and was no longer her physician. AR. at 21. The ALJ noted a lack of consistency between Dr. Mehta's opinions because Dr. Mehta did not document any

complaints of attention or concentration problems in his other progress notes around that time. AR. at 21; *see* AR. at 446-49. The ALJ also noted Dr. Bertoglio's opinions, that Dr. Bertoglio was Lonsfoote's treating physician, and that Dr. Bertoglio had been treating Lonsfoote for over a year (specifically noting a report from November 2009). AR. at 19, 21. And importantly, the ALJ noted that Lonsfoote did not follow Dr. Bertoglio's medical advice. AR. at 21. The ALJ's explanation is thus sufficient for the Court to conclude that he adequately addressed the requirements of Section 404.1527(c)(2) in determining what weight to afford the opinions of Lonsfoote's treating physicians.

In sum, the ALJ was required to resolve the conflicts where reasonable minds might differ, *see Terry*, 580 F.3d at 478, and he did that here. The Court believes substantial evidence supports the ALJ's decision to give little weight to Dr. Bertoglio and Dr. Mehta's opinions and that the ALJ's overall explanation was adequate. Lonsfoote's arguments related to the weight afforded to her treating physicians' opinions fail.

## III.  Fibromyalgia as "Non-Severe"

Lonsfoote's third argument is that the ALJ erred in finding her fibromyalgia "non-severe" and, as a result, fashioned an improper RFC. She contends the ALJ erred in only relying on the physicians' use of the 18-point "trigger test" to determine whether she suffers from fibromyalgia.[10] *See* AR. at 17. Essentially, she

---

[10] Lonsfoote argues in passing that Dr. Freeman's opinion should be disregarded because he "is an internist and not a rheumatologist, orthopedic or pain specialist." R. 16 at 13. Yet, as the Commissioner points out, none of the medical professionals

believes that if the ALJ had followed Social Security Ruling 12-2P, 2012 WL 3104869 (July 25, 2012), which provides a new, alternative way to establish fibromyalgia, the ALJ would have found her fibromyalgia as "severe."

Under Section II.B of Social Security Ruling 12-2P, fibromyalgia may be determined by (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms; and (3) evidence that other disorders that could cause the repeated manifestations of symptoms were excluded. 2012 WL 3104869, at *3. First, courts have held that the 18-point trigger test the ALJ noted in his written opinion "can 'more or less objectively' establish [fibromyalgia] where the findings of the test are consistent with [the disease]." *Weitzenkamp v. Unum Life Ins. Co. of Am.*, 661 F.3d 323, 331 (7th Cir. 2011) (citing *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003); *Chronister v. Baptist Health*, 442 F.3d 648, 656 (8th Cir. 2006)). The ALJ noted that having "8 out of 18 positive trigger points for fibromyalgia" did not warrant a "severe" impairment conclusion, AR. at 17, and Lonsfoote does not direct the Court to any case or authority establishing that an ALJ errs by relying on the 18-point trigger test's results in making this determination. Also, Social Security Ruling 12-2P did not become effective until nearly two years after the ALJ's decision, even though the criteria adopted is from 2010. 2012 WL 3104869, at *2. The Court cannot fault the

---

of record are rheumatologists, R. 23 at 7, and the ALJ afforded little weight to the opinion of Lonsfoote's pain specialist, Dr. Mehta. AR. at 21. This argument is therefore rejected.

ALJ for failing to note a test in a Social Security Ruling that had not yet been released.

Nonetheless, even under Ruling 12-2P, the ALJ still properly determined Lonsfoote's fibromyalgia was "non-severe." Looking to the third element alone, the medical records fail to exclude other disorders that could cause the repeated manifestations. Lonsfoote was told she had myofascial pain syndrome,[11] a similar but distinct disorder. AR. at 277. Lonsfoote had a blood test that showed she had "a positive rheumatoid factor on and off," as noted by Dr. Karri, AR. at 346, which is significant because rheumatologic disorders cause similar symptoms as those found with fibromyalgia. *See* Social Security Ruling 12-2P, 2012 WL 3104869, at n.7. And lastly, a number of the symptoms that Lonsfoote highlights could easily be attributed to her spondylolisthesis—e.g., Lonsfoote points to page 381 of the Administrative Record for the symptom of "poor sleep," but this is checked under the heading "symptoms from the spinal disorder." The evidence of these other possible disorders contradicts Lonsfoote's argument that the ALJ would have found her claim of fibromyalgia to be a severe MDI had he applied Social Security Ruling 12-2P.

---

[11] "Myofascial pain syndrome is a chronic form of muscle pain that centers around sensitive (trigger) points in a person's muscles." *Milliken v. Astrue*, 397 Fed. Appx. 218, 220 (7th Cir. 2010) (citing MayoClinic.com, Myofascial pain syndrome, http://www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042 (last visited Oct. 8, 2010)).

The ALJ did not err in concluding that Lonsfoote's fibromyalgia was "non-severe." Accordingly, the Court need not elaborate on Lonsfoote's argument that the resulting RFC was incorrect.

## IV.    The ALJ's Consideration of "Severe" Symptoms

Lonsfoote's next contention is that the ALJ did not consider symptoms he deemed "severe" in formulating her RFC. Specifically, she argues that the ALJ did not include limitations from her mental impairment (depression) or physical impairments resulting from the side effects of her medication and the use of a cane. The Court disagrees.

Beginning with Lonsfoote's depression, the ALJ noted that Lonsfoote's depression is severe, AR. at 16, so he was required to evaluate the severity of the mental impairment and evaluate the consequences relevant to Lonsfoote's ability to work. 20 C.F.R. § 404.1520a(a). An ALJ does this by rating the functional limitations in "four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." § 404.1520a(c). The first three categories are rated on the following five-point scale: none, mild, moderate, marked, and extreme. § 404.1520a(c)(4). Here, the ALJ rated Lonsfoote's daily activities limitations as moderate, her social limitations as mild, and her concentration limitations as mild. AR. at 20-21. He also rated her as never having had an episode of decompensation of extended duration. AR. at 21. This indicates the ALJ properly considered Lonsfoote's depression in formulating his RFC.

Lonsfoote disputes this, contending that the limitations in her daily activities from depression were not *specifically* mentioned in the RFC. R. 16 at 13. But Lonsfoote's daily activities are limited due to her exertional limitations related to moving or her inability to remain in one position for a prolonged period of time without pain, not as a result of depression. AR. at 20. The ALJ considered that point when he discussed how Lonsfoote related well during the hearing and during her examination with Dr. Okoli, who indicated that Lonsfoote did not have problems with concentration or relating with co-workers. AR. at 22, 458-59. The ALJ further acknowledged that Lonsfoote herself said "her condition is physical, not mental," AR. at 22; so there was no reason for the ALJ to make special note of Lonsfoote's depression in her RFC as it related to daily activities. The Court concludes that the ALJ adequately considered Lonsfoote's depression in formulating her RFC.[13]

With respect to the physical impairments Lonsfoote claims were not considered, these arguments are equally without merit. The ALJ explained that Lonsfoote was able to complete "skilled work" on narcotic medication for at least "a whole year before she stopped work." AR. at 20. Lonsfoote did this despite her contention that the side effects of her medication (e.g., fatigue and concentration problems) prevented her from doing so. The ALJ also said that concentration

---

[13] Lonsfoote also contends the ALJ failed to consider certain mental health records. R. 16 at 13-14. As the Commissioner points out, Lonsfoote's attorney did not timely submit them, R. 23 at 7—for reasons unknown to this Court—and Lonsfoote has not demonstrated how the evidence is "material" or that "there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Schmidt v. Barnhart*, 395 F.3d 737, 741-42 (7th Cir. 2005). Without this information, any argument on this ground fails.

problems, from medication or otherwise, were only "a mild limitation" and that Lonsfoote does not receive any "formal mental health treatment." AR. at 21. These comments demonstrate the ALJ considered the side effects of Lonsfoote's medication.

Furthermore, the ALJ noted that Lonsfoote used a walker at the July 14, 2010 hearing, yet had nothing at her consultation on October 4, 2010. AR at 20; *see* AR. at 461. The Court has already upheld the ALJ's credibility determination, so any argument here as to the ALJ's interpretation of the conflicting information regarding Lonsfoote's ability to walk also fails. And regardless, the RFC does not require a significant amount of walking, so the ALJ necessarily would have taken this information into account. *See* AR. at 18 (citing 20 C.F.R. §§ 404.1567(a), 416.967(a)).

At bottom, Lonsfoote might not agree with the ALJ's RFC calculation, but the ALJ adequately considered all three "severe" symptoms that Lonsfoote highlights here in formulating Lonsfoote's RFC.

## V. Finding That Lonsfoote Could Perform Her Past Work

Lastly, Lonsfoote argues without any evidentiary support or case law that the evidence does not support the ALJ's finding that she could continue to work as a medical coder. She simply states, first, that had the ALJ accurately determined her RFC, including difficulty concentrating, then he would have found her unable to continue to work as a coder; and second, that the ALJ failed to question her about

the mental requirements of her past job and whether it would have allowed for a sit/stand option. R. 16 at 15.

Initially, as discussed above, the ALJ did consider the record, in addition to Lonsfoote's answers and demeanor during the hearing, and determined that the pain and its effects were not as severe as she claimed. Lonsfoote's conclusory assertions here are insufficient to overcome the Court's prior determination that substantial evidence supports the ALJ's decision and that his credibility determination was not patently wrong. Next, the burden is on Lonsfoote to demonstrate she is disabled, *see Pepper*, 712 F.3d at 351, but she does not explain how the ALJ erred in not asking her if a postural change would have been allowed. If that was a question that needed to be answered, Lonsfoote was represented at the hearing, and her counsel could have easily elicited that answer. *Id.* (noting that a "claimant represented by counsel is presumed to have made his best case before the ALJ" (quoting *Skinner*, 478 F.3d at 842). But in any event, the Court finds the ALJ's questioning to have been thorough and comprehensive.

Lonsfoote's argument that the record evidence does not support the ALJ's finding that she could perform her past work is ultimately without merit.

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's decision was supported by substantial evidence, the ALJ adequately explained his conclusions, and the ALJ's credibility determination was not patently wrong. Lonsfoote's motion

for summary judgment is therefore denied, R. 15, and the ALJ's denial of benefits is affirmed.

ENTERED:

_Thomas M. Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: November 20, 2013